# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GUARANTEED RATE, INC.,     )
    )
    *Plaintiff,*     )
    )   17-cv-3289
vs.     )   Judge Thomas M. Durkin
    )
BARDEN CONN, CRAIG STELZER, RICHARD     )
ROMANO, RICHARD FEDELE, TERRY BAKER,     )
CROSSCOUNTRY MORTGAGE, INC.,     )
    )
    *Defendants.*     )

## MEMORANDUM OPINION AND ORDER

CrossCountry Mortgage, Inc. ("CCMI") [1] has moved to dismiss the conspiracy to breach fiduciary duties claim brought by Guaranteed Rate, Inc. ("GRI"). [2] The basis for CCMI's motion is lack of personal jurisdiction. In addition, CCMI moves for a protective order from further discovery. Terry Baker and Craig Stelzer also have moved to dismiss GRI's conspiracy claim. Baker moves to dismiss for lack of personal jurisdiction, and Stelzer moves to dismiss for failure to allege facts demonstrating any act of misconduct committed by him individually. For the reasons that follow, CCMI's and Baker's motions are granted, and Stelzer's motion is denied.

---

[1] CCMI's name appears in the ECF system as "CrossCounty," but based on that party's filings the correct spelling is "CrossCountry."

[2] *See* R. 26 at 14 (Verified First Amended Complaint, Count II—Conspiracy To Breach Of [sic] Fiduciary Duties—All Defendants").

**BACKGROUND**

GRI is a Delaware corporation that provides residential mortgage loans to consumers and then resells those loans in the secondary market to government-sponsored entities like Freddie Mac and Fannie Mae, national and regional banks, and other private investors. GRI is headquartered in Chicago, Illinois, but is licensed to do business in every state. It employs approximately 3,000 people in approximately 175 branch offices across the country. At the time of the events at issue, GRI organized its U.S. business into five regional "divisions." Among those was the Eastern Division, which included each of the states on the Atlantic coast except South Carolina and Georgia, as well as West Virginia and Vermont. The Eastern Division was organized into multiple regions, and each region contained one or more branch offices. Richard Fedele, Bardon Conn, Richard Romano, Craig Stelzer, and Terry Baker (collectively the "Individual Defendants") are all former high-ranking employees of GRI who lived in states on the east coast and worked for GRI in the Eastern Division.[3]

---

[3] Fedele was Senior Vice President and Divisional Sales Manager in the Eastern Division, and one of the highest ranking employees in the company as a whole. He was responsible for managing all of GRI's business in the Eastern Division, including some 275 employees and approximately $7 billion of mortgages in 2016 alone. His compensation for that year was in excess of $2.3 million. Conn reported directly to Fedele as Senior Vice President and East Regional Manager. He was responsible for managing and supervising several branch managers and branch offices in Massachusetts, Maine, and New Hampshire, and his compensation in 2016 was in excess of $1 million. Romano also reported directly to Fedele and was one of the top producing mortgage originators in the United States. He was responsible for managing the majority of GRI's branch offices in Florida and the approximately 117 employees who worked there. His compensation in 2016 was in excess of $1.2 million. Stelzer was a Vice President of Mortgage Lending who

At some point during their employment, each of the Individual Defendants entered into written compensation agreements with GRI. While the exact language may vary in each of the agreements at issue, more or less they provide—by way of what GRI refers to as an "*in-term* employee non-solicitation covenant"—that the Individual Defendants, while still employed by GRI and for a period of either twelve or twenty-four months thereafter, would not

> directly or indirectly, including through a third party, except in the interests of GRI, hire or retain, or solicit, encourage or have contact with any of GRI's employees for the purpose of encouraging them to end their employment with GRI and/or join the Employee as a partner, agent, employee, or otherwise in a business venture or other business relationship.

R. 26-1 at 23.

In the event that the Individual Defendants breached the non-solicitation covenant, they agreed to liquidated damages in the amount of $50,000 per solicited employee. The agreements further state that GRI would be entitled to specific performance of the non-solicitation covenant by way of temporary and/or permanent injunctive relief. Each of the agreements, with the exception of the one signed by Baker, has a choice of law and venue provision stating that the agreement is to be governed and construed in accordance with Illinois law, and that, by executing the agreement, the employee "irrevocably submit[s] to the exclusive jurisdiction of the

reported to Romano. He was GRI's 13th highest volume loan originator in 2016, and his compensation in that year was approximately $900,000. Baker was GRI's Regional Manager in New England responsible for managing branch offices in Vermont, Massachusetts, New Hampshire, Connecticut, Florida, New York, and Rhode Island. He worked out of GRI's Boston office, reported to Fedele, and received in excess of $900,000 as compensation in 2016.

courts of the State of Illinois and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding arising with respect to this Agreement." *Id.*

GRI alleges that, beginning in February 2017, Fedele, Conn, and Romano began to plan their departures from GRI by shopping their business and the business of other GRI employees to GRI's competitors. To this end, they met with other competitors of GRI and ultimately with CCMI to discuss the potential of their employment and expansion of CCMI's East Coast business. CCMI, Fedele, Conn, and Romano referred to their joint plan as "Project Bruin." Fedele, Conn, and Romano allegedly solicited Stelzer as well as other GRI employees to join them at CCMI, and some or all of the Individual Defendants met in person with CCMI in Ohio where CCMI is located.[4] GRI alleges that, in March 2017, Fedele, Conn, and Romano accessed GRI's confidential business information and shared that information with CCMI through the exchange of pro forma income statements.

In mid-April 2017, Fedele, Conn, and Romano made written demands on GRI for unpaid compensation allegedly owed to them. A few days later, Romano and Stelzer gave GRI notice of their resignations. Shortly thereafter, GRI questioned Conn about whether he had ever communicated with CCMI, and then terminated his employment after deciding that his responses were evasive. A day later, Stelzer

---

[4] CCMI is incorporated in Ohio with its principal place of business in Ohio.

made a demand to GRI for additional compensation, and a day after that, Fedele submitted his resignation.[5]

GRI filed this lawsuit slightly more than a month after Fedele's resignation. The original complaint, filed on May 1, 2017, named only three defendants—Conn, Stelzer, and Romano—and alleged claims for breach of contract, breach of fiduciary duty, and tortious interference with business relations. The amended complaint, filed on June 15, 2017, added Fedele, Baker, and CCMI as defendants, and alleges claims for (1) breach of fiduciary duties against Fedele, Conn, and Romano (Count I); (2) conspiracy to breach fiduciary duties against all defendants (Count II); and (3) breach of the contractual "*in-term* employee non-solicitation covenant" against Fedele, Conn, and Romano (Count III). *See* R. 26. GRI seeks an injunction prohibiting (i) CCMI from employing the Individual Defendants; (ii) the Individual Defendants from either working together or providing services to CCMI;[6] and (iii) any of the defendants from disclosing GRI's confidential business information.[7]

---

[5] Apparently, Baker had resigned from GRI several months earlier (on February 20, 2017, to be exact), which was right around the time the complaint alleges Fedele, Conn, and Romano first began conspiring to leave GRI as a group.

[6] The compensation agreements have a provision prohibiting each Individual Defendant from "supervis[ing], manag[ing] or oversee[ing] the work of any former GRI employee he learned of or worked with during Employee's employment with GRI" for either twelve or twenty-four months (depending on the agreement) following the termination of his employment with GRI. R. 26-1 at 23. Although the complaint does not contain an allegation that the Individual Defendants violated this provision, GRI apparently seeks injunctive relief based on it.

[7] The compensation agreements contain a detailed provision setting forth the Individual Defendants' duties with respect to GRI's confidential business information. While GRI alleges that the some or all of the Individual Defendants

R. 26 (¶ 7). GRI also seeks an order declaring that the Individual Defendants have forfeited their compensation in all forms for the period in which they were in breach of their fiduciary duties, as well as an order of disgorgement of the "wrongful gains" of the defendants in an amount to be determined at trial." *Id.*

## DISCUSSION

### A. PERSONAL JURISDICTION

"[A] complaint need not include facts alleging personal jurisdiction. However, once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (internal quotation marks and citation omitted). When the court rules on the motion without a hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Id.* "In evaluating whether the prima facie standard has been satisfied, the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Id.* (internal quotation marks and citations omitted). As the Court is sitting in diversity here, it has personal jurisdiction over the parties to the extent that an Illinois court could exercise such jurisdiction. *Philos Techs., Inc. v. Philos & D, Inc.,* 645 F.3d 851, 855 n.2 (7th Cir. 2011). "Illinois extends personal jurisdiction to the limits allowed by the United States Constitution, so the state and federal standards are congruent here." *Id.*

---

misused GRI's confidential business information by sharing it with CCMI, the complaint does not allege a specific claim for breach of the confidentiality provision.

### 1. CCMI

There are two branches of due process personal jurisdiction jurisprudence—general and specific. *uBid, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). GRI argues that the Court has personal jurisdiction over CCMI under either theory.

### a. GENERAL JURISDICTION

A court's authority to assert personal jurisdiction over a defendant in a suit that does not arise out of or is not related to the defendant's contacts with the forum in known as general jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (discussing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). The standard for finding general jurisdiction is a "demanding" one under which a defendant can only be haled into court when it has "'continuous and systematic general business contacts' with the forum state." *uBid, Inc.,* 623 F.3d at 425-26 (quoting *Helicopteros Nacionales de Colombia, S.A*, 466 U.S. at 415-16).

The Supreme Court's opinions in *BNSF Railway Co. v. Tyrrell*, 137 S. Ct. 1549 (2017), and *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), are conclusive on the general jurisdiction issue here. In *BNSF Railway Co.*, a Montana state court asserted general personal jurisdiction over the BNSF railroad on the ground that the railroad had over 2,000 miles of railroad track and employed more than 2,000 workers in Montana. The Supreme Court rejected that factual predicate as a basis for general jurisdiction, holding that general jurisdiction is only appropriate where

the forum is the defendant's "home" state. The Court reiterated its earlier holding in *Daimler* that the "paradigm forums" in which a corporate defendant is "at home" are the corporation's place of incorporation and its principal place of business. *Id.* at 1558. GRI alleges that CCMI is an Ohio corporation with its principal place of business in Ohio, R. 26 (¶ 14), so CCMI does not fit within the paradigmatic model.

While general jurisdiction theoretically may be found even though the forum is neither the defendant's state of incorporation nor its principal place of business, general jurisdiction nevertheless "requires an equivalent place," *Goodyear Dunlop Tires Operations,* 564 U.S. at 924, in other words, a place where the corporation has "affiliations so 'continuous and systematic' as to render [the foreign corporation] essentially at home in the forum State, *i.e.*, comparable to a domestic enterprise in that State." *Daimler AG*, 134 S. Ct. at 758 n. 11 (quoting *Goodyear Dunlop*) (internal quotation marks omitted). In *Daimler,* a German automobile manufacturer sold automobiles in the United States through an exclusive distributor, which had multiple California-based facilities. Ten percent of the distributer's sales took place in California, which accounted for 2.4% of the manufacturer's worldwide sales. *Id.* at 752. But the Supreme Court said that even if it were to assume that the distributor's contacts were imputable to the manufacturer, there still would be no basis to subject the manufacturer to general jurisdiction in California. *Id.* at 760. To hold otherwise, the Supreme Court said, would be to allow general jurisdiction to reach every state in which sales are sizable, which would not "permit out-of-state defendants to structure their primary

conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.* at 762 (internal quotation marks and citation omitted). The Court emphasized that only in an "exceptional case" would general jurisdiction be available anywhere other than the place of incorporation and principal place of business, and discussed, as an example of such a case, *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952), where the defendant, a silver and gold mining operation incorporated under the laws of the Philippines, could be sued in Ohio because a world war forced the defendant to temporarily relocate its principal place of business to Ohio due to enemy activity abroad. *Id.* at 756 and n. 8. There is no similarly compelling case to be made for exercising general jurisdiction in this case.

GRI asserts that it has met the "continuous and systematic" standard because CCMI (1) is registered to do business in Illinois; (2) holds an Illinois Residential Mortgage License; (3) originated over $215 million in loans in Illinois in 2016; (4) operates at least thirteen branches in Illinois; and (5) employs dozens of people in its Illinois branches. R. 65 at 11. A similar argument, however, was rejected by the Supreme Court in *Daimler* as "unacceptably grasping." 134 S. Ct. at 761. Nonetheless, GRI cites two cases to support its general jurisdiction argument. The first—*Aspen American Insurance Co. v. Interstate Warehousing, Inc.*, 57 N.E.3d 656 (Ill. App. 2016)—drew a strong dissent and currently is on appeal before the Illinois Supreme Court, *see* 65 N.E.3d 839 (Ill. 2016) (allowing appeal). The second—*Barriere v. Cap Juluca*, 2014 WL 652831 (S.D. Fla. Feb. 19, 2014)—upheld

general jurisdiction over an Anguilla corporation where the injury at issue occurred in Anguilla and the corporation's only Florida contacts included its operation of a single Miami sales office plus sales offices maintained by an agent of the corporation that promoted and provided reservation services for the Anguilla resort where the injury took place. *Id.* at *5. The court concluded it could exercise jurisdiction based on these contacts, citing the need to prevent foreign corporations from "freely solicit[ing] and accept[ing] business from Americans in the United States and at the same time be completely shielded from any liability in U.S. courts from any injury that may arise as a result." *Id.* at *8.

The *Barriere* court's concern with a foreign corporation not being subject to suit anywhere else in the United States is not present here. In addition, other courts within the same district have recognized that *Barriere* was decided without the benefit of the Eleventh Circuit's interpretation of *Daimler* in decisions entered subsequently. *See Waite v. AII Acquisition Corp.*, 2016 WL 2346768, at *5 (S.D. Fla. Mar. 10, 2016). In any event, *Barriere* was decided before the Supreme Court's decision in *BNSF Railway Co.* If the maintenance of 2,000 miles of railroad track and employment of more than 2,000 workers in the forum state cannot establish general jurisdiction as the Supreme Court held in *BNSF Railway*, then the business allegedly conducted by CCMI in Illinois in this case cannot either. Therefore, the Court must reject GRI's general jurisdiction theory. *See Commissioning Agents, Inc. v. Long*, 143 F. Supp. 3d 775, 785 (S.D. Ind. 2015) (rejecting general jurisdiction against competitor based on allegations similar to those here).

### b.   SPECIFIC JURISDICTION

Specific jurisdiction grows out of "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). This type of jurisdiction requires that "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014) (internal quotation marks and citation omitted). "The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *Id.*

GRI asserts a claim against CCMI for conspiracy to breach fiduciary duties based on CCMI's alleged participation in the solicitation of GRI employees and misuse of GRI's confidential business information by Fedele, Conn, and Romano. Traditionally when dealing with tort claims, courts will look to whether the plaintiff has shown "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo v. Dworkin*, 601 F.3d 693, 703 (7th Cir. 2010). This is known as the *Calder*

test, after *Calder v. Jones*, 465 U.S. 783 (1984). GRI relies on the *Calder* test in arguing for specific jurisdiction here.[8]

There is little question that GRI's allegations satisfy the first and third prongs of the *Calder* test. The problem is with the second prong, which requires that the defendant's tortious conduct must be "expressly aimed at the forum state." GRI argues that the expressly aiming requirement is met because CCMI knew that the Individual Defendants "had agreed to *in-term* solicitation covenants in their agreements with Guaranteed Rate and that breaches of these covenants would result in litigation," and also knew "that the projections and other materials that it and the Individual Defendants were preparing for CCMI's new branches were based on Guaranteed Rate's confidential information—information that the Individual Defendants could have only accessed on Guaranteed Rate's network by interacting with its servers located in Illinois." R. 65 at 9. In support of these arguments, GRI cites *Astro-Med, Inc. v. Nihon Kohden America, Inc.,* 591 F.3d 1 (1st Cir. 2009).

---

[8] A theory separate from the *Calder* effects test for asserting jurisdiction over alleged conspirators is sometimes applied by courts. "The idea behind this theory is that personal jurisdiction is proper over an out-of-state defendant in a forum where one of his co-conspirators has acted as the defendant's agent in furtherance of the conspiracy." *Smith v. Jefferson Cnty. Bd. of Educ.*, 378 Fed. App'x 582, 585 (7th Cir. 2010). The Seventh Circuit has said that the conspiracy theory of jurisdiction "may not be valid in Illinois." *Id.* (citing cases). In any event, GRI does not purport to rely on the conspiracy theory of personal jurisdiction in opposing either CCMI's or Baker's motion to dismiss, presumably because the complaint does not allege that any of the alleged acts of the participants in the conspiracy occurred in Illinois. *See Cleary v. Philip Morris, Inc.,* 726 N.E.2d 770, 773 (2000) (the conspiracy theory of jurisdiction requires "a substantial act in furtherance of the conspiracy *in Illinois*") (emphasis added).

In *Astro-Med,* the First Circuit approved the assertion of personal jurisdiction over a competitor because the competitor hired the plaintiff's former employee knowing (1) that the plaintiff was located in the forum state, (2) that the former employee had entered into an employment agreement in the forum state, (3) that the contract specified it would be governed by the law of the forum state, (4) that the contract contained non-competition and non-disclosure provisions, and (5) that by virtue of the contract, the former employee had consented to the exclusive jurisdiction of the courts of the forum state over any disputes related to the contract. *Id.* at 9. The First Circuit noted that the "purposeful availment" prong of the due process analysis focuses on "voluntariness and foreseeability," and that the competitor in that case "was fully aware of the [employment contract], including its [forum] provisions, and persisted in negotiations in the face of legal advice from its own counsel that to do so would pose a risk." *Id.* at 10. Therefore, the court held, it was "foreseeable to [the competitor] that it 'might be held accountable for [its actions]" in the plaintiff's home state. *Id.*

*Astro-Med* is a bit of an outlier in the case law. Most of the cases in which personal jurisdiction has been upheld in a business tort context case like the present one have found jurisdiction only where the defendant had some direct contact with the forum.[9] Moreover, a district court in the Third Circuit rejected

---

[9] *See, e.g., Montel Aetnastak, Inc. v. Miessen,* 998 F. Supp. 2d 694, 712 (N.D. Ill. 2014) (jurisdiction in Illinois upheld where plaintiffs' injury occurred there when its former employee misappropriated confidential information and shared that information with her prospective new employer, which was located in Illinois); *Gen. Motors Corp. v. Ignacio Lopez de Arriortua*, 948 F. Supp. 656, 665 (E.D. Mich. 1996)

personal jurisdiction on facts similar to those in *Astro-Med. See Radian Guar. Inc. v. Bolen*, 18 F. Supp. 3d 635 (E.D. Pa. 2014). The *Radian* court based its decision primarily on *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254 (3d Cir. 1998), where the Third Circuit rejected a broad reading of *Calder* and agreed with those courts that had expressed "concern over whether a court can automatically infer that a defendant expressly aimed its tortious conduct at the forum from the fact that that defendant knew that the plaintiff resided in the forum." *Id.* at 262. Applying *IMO Industries*, the *Radian* court explained:

> [The plaintiff] fails to explain how the creation of the [competitor's] employment relationship with [the plaintiff's former employee] intentionally targeted or focused on Pennsylvania. [The plaintiff] does not allege that the [competitor] met with or recruited [the former employee] in Pennsylvania. [The plaintiff] does not allege that the [competitor] hired [the former employee] to work in or serve customers in Pennsylvania. Indeed, in both her role with [the plaintiff] and the [competitor], [the former employee] worked exclusively from Texas serving customers in the southern United States. As explained in the case law, the allegations that the [competitor] knew that [the plaintiff's] headquarters were in Pennsylvania and that the forum selection clause identified Pennsylvania courts as the venue for resolving disputes are insufficient to meet the "expressly aimed" standard.

---

(jurisdiction in Michigan proper over foreign competitor based on allegations of theft of plaintiff's trade secrets which took place in Michigan pursuant to a conspiracy by and on behalf of the foreign competitor in concert with then Michigan residents); *Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 722 (D.S.C. 2007) (personal jurisdiction over competitor in South Carolina proper where plaintiff alleged its competitor contacted and hired several of its key employees in South Carolina).

18 F. Supp. 3d at 644-45. Other cases have reached the same result as *Radian* on similar facts.[10]

This Court's agreement with this latter line of cases is buttressed by the Supreme Court's decision in *Walden*. To the extent that it might have been unclear prior to that decision, the Supreme Court in *Walden* firmly established that, regardless of how foreseeable it may be that the defendant might be sued in a particular forum, due process is not satisfied where the plaintiff is the only link between the defendant and that forum. Instead, due process usually requires some *conduct* by the defendant *in* the forum. *Walden,* 134 S. Ct. at 1122-25; *see Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1781 (2017) ("For a court to exercise specific jurisdiction over a claim there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.") (internal quotation marks and citation omitted). As the Seventh Circuit has explained, "the defendant

_____

[10] *See, e.g., R.J. Carbone Co. v. Regan*, 582 F. Supp. 2d 220, 223-24 (D.R.I. 2008) ("There is no deliberateness to whatever tenuous relationship [the out-of-state competitor] ha[d] with Rhode Island as [employee's] new employer. Any 'at home' impact due to alleged interference in Connecticut or New York or New Jersey does not create a meaningful connection with Rhode Island, such that [the competitor] could foresee being haled into this forum."); *May Dep't Stores Co. v. Wilansky*, 900 F. Supp. 1154, 1161 (E.D. Mo. 1995) (holding that due process considerations did not allow assertion of personal jurisdiction over a competitor where "[n]othing in the record indicates that [the competitor] utilized any form of communication with any person in Missouri in connection with its negotiations with [the former employee]"); *Blue Beacon Int'l, Inc. v. Am. Truck Washes, Inc.*, 866 F. Supp. 485, 488 (D. Kan. 1994) (although plaintiff alleged "there was a concerted attempt by [competitor] to raid [plaintiff] of its employees, misappropriate [plaintiff's] trade secrets and harm [plaintiff] at its corporate home in Salina, Kansas," personal jurisdiction over competitor rejected where no tort ever occurred within the state and competitor was never present in the state when the tortious acts were committed).

[in *Walden*] knew that the plaintiffs were going to Nevada, and it was foreseeable that they would want the use of their money there, but the Court squarely rejected this as a permissible basis for jurisdiction. The mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction. . . . The relation between the defendant and the forum must arise out of contacts that the defendant *himself* creates with the forum State." *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014) (emphasis in original) (quoting *Walden*) (internal quotation marks and citation omitted).

*Walden* calls into question the First Circuit's expansive application of *Calder* in *Astro-Med*. "[A]fter *Walden* there can be no doubt that 'the plaintiff cannot be the only link between the defendant and the forum.' Any decision that implies otherwise can no longer be considered authoritative." *Advanced Tactical,* 751 F.3d at 802 (quoting *Walden*). *Astro-Med* found personal jurisdiction based on "voluntariness and foreseeability," but those factors can no longer be the sole basis for jurisdiction.[11] For this reason, the Seventh Circuit in *Advanced Tactical* rejected

---

[11] The *Walden* Court re-interpreted *Calder,* explaining that the "crux" of that case was not the foreseeability and voluntariness of the defendant's conduct but rather "the reputation-based 'effects' of the alleged libel," which "connected the defendants to California, not just to the plaintiff." 134 S. Ct. at 1123-24. "The strength of that connection was largely a function of the nature of the libel tort. . . . [B]ecause publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California." *Id.* at 1124. *see also Strabala v. Zhang*, 318 F.R.D. 81, 110 (N.D. Ill. 2016) ("Defendants purposefully aimed their conduct at Illinois by seeking to damage Strabala's reputation in Illinois where the e-mail recipients were located."). This case, of course, does not involve a reputational injury caused by the publication of defamatory material in Illinois.

the argument that personal jurisdiction was proper because the defendant knew that the plaintiff was an Indiana company and could foresee that its misleading emails and sales would harm the plaintiff in Indiana," stating that *Walden* "shows the error of this approach." *Id.*

Here, GRI makes no arguments based on contacts between CCMI and Illinois; its only arguments are based on facts allegedly showing foreseeability stemming from GRI's and the Individual Defendants' connections to Illinois. CCMI's contacts with the Individual Defendants appear to have all occurred outside of Illinois. CCMI is located in Ohio, and all of the Individual Defendants live and work in states other than Illinois.[12] No alleged conspiratorial meetings or communications among co-conspirators are alleged to have occurred in, from, or to Illinois. The purported aim of the conspiracy was for CCMI to employ the Individual Defendants and any other recruited employee of GRI in states other than Illinois. There are no allegations that a GRI employee located in Illinois was solicited, or that the intent of CCMI in hiring the Individual Defendants was to expand its business in Illinois. To the extent that the Individual Defendants may have obtained and used GRI's confidential information, that information would have been transmitted by the Individual Defendants from their locations outside Illinois to CCMI, also outside Illinois. In short, GRI has not alleged a single fact from which

---

[12] The complaint alleges that Fedele and Baker are citizens of Massachusetts, Stelzer and Romano are citizens of Florida, and Conn is a citizen of New Hampshire.

the Court could infer that CCMI took any purposeful action of any kind in or directed at Illinois.[13]

In sum, CCMI's alleged activities, including hiring individuals (who lived and worked outside of Illinois) to work for it (also outside of Illinois) and making use (also outside of Illinois) of GRI's confidential information, may have "targeted" GRI, but it cannot be said that those activities "targeted" Illinois. As a result, CCMI could not have expected to be haled into court in Illinois for those activities. Accordingly, CCMI's motion to dismiss must be granted. Because the Court dismisses CCMI for lack of personal jurisdiction, the Court does not need to address

---

[13] These facts distinguish two other cases cited by GRI that were decided after *Walden*. In *MaxLite, Inc. v. ATG Electronics, Inc.*, 193 F. Supp. 3d 371 (D.N.J. 2016), the court found personal jurisdiction in the plaintiff's home state over a competitor who allegedly recruited former employees while they were working for the plaintiff. The court did not acknowledge *Walden* let alone discuss the impact of that decision on the *Calder* test, and continued to emphasize foreseeability as the focus of the inquiry. In any event, the court held that jurisdiction was proper in New Jersey because the employee defendants streamlined the competitor's internal operations so that New Jersey customers dealt with a single point person, devised a marketing campaign for the competitor that included New Jersey, hired an independent sales representative who targeted northern New Jersey, and instructed another existing sales representative to grow the competitor's business in southern New Jersey. *See id.* at 387-88. And, in *Commissioning Agents, Inc.*, 143 F. Supp. 3d 775, the court found personal jurisdiction in Indiana where the plaintiff alleged that a former employee stole proprietary information and used it on the competitor's behalf. The court's ruling was based on a theory of either apparent agency or ratification, with the court finding that the former employee's alleged misconduct in misappropriating the plaintiff's confidential business information, which occurred in the forum state, could be attributed to the competitor. *Id.* at 793-94.

CCMI's alternative argument that the complaint fails to allege a plausible conspiracy claim against it.[14]

## 2. TERRY BAKER

The complaint alleges that jurisdiction over Baker is proper because of the forum selection clause in his compensation agreement. But GRI attaches that agreement to the complaint and, contrary to GRI's allegations, the agreement does *not* contain a forum selection provision.[15] The question thus is whether Baker is subject to jurisdiction in Illinois over the current dispute based on the fact that he was formerly employed by GRI, which has its principal place of business in Illinois. GRI does not make any argument regarding general jurisdiction, and thus the Court assumes that GRI's jurisdictional arguments are made in reference to specific jurisdiction only.

---

[14] State law regarding what is required to plead and prove a conspiracy claim varies. For instance, some states hold that "parties not subject to a duty cannot be liable for conspiracy to breach it." *1-800 Contacts, Inc. v. Steinberg*, 132 Cal. Rptr. 2d 789, 80-09 (Cal. App. 2003). Under this principle, CCMI could not be held liable for conspiracy to breach the fiduciary duties of any of the Individual Defendants because CCMI itself owes no fiduciary duties to GRI. While the claims against Stelzer (as well as Fedele, Conn, and Romano) likely are governed by Illinois law per the compensation agreements they signed, the claims against Baker and CCMI may very well not be. *See, e.g., Foodcomm Int'l v. Barry,* 463 F. Supp. 2d 818, 829 (N.D. Ill. 2006). The Court need not address the choice of law issue, however, because GRI's claims against CCMI and Baker are dismissed for lack of personal jurisdiction.

[15] As previously noted, the other Individual Defendants all executed compensation agreements with a forum selection provision that waived any objection to jurisdiction in Illinois. Therefore, Baker is the only Individual Defendant who can move to dismiss on this basis.

According to Baker, he lacks any meaningful connection to Illinois. He neither worked here nor voluntarily subjected himself to jurisdiction here through his compensation agreement. And, just as in the case of CCMI, no act forming the basis of his alleged liability to GRI took place in Illinois. GRI nevertheless argues that Baker can be subject to suit in Illinois because (1) GRI required him to visit GRI's headquarters in Chicago for various reasons such as to attend annual meetings as well as to participate in twice monthly conference calls with personnel in Chicago; (2) Baker "frequently" participated in such conference calls; and (3) Baker did visit Chicago for business at least three times between 2013 and 2016. In addition, GRI contends that any time Baker logged into GRI's computer network from his computer on the East coast, and every time he sent or received communications using his business email address, he interacted with GRI's servers in Illinois. Finally, GRI contends that Baker is subject to jurisdiction in Illinois because he "worked at the behest of an Illinois corporation." R. 63 at 4 (initial caps omitted).

To begin with, the statement that Baker worked for an Illinois corporation is somewhat misleading as GRI is incorporated in Delaware, not Illinois. In addition, the connections between Baker and Illinois on which GRI relies do not appear to be related to any of the conduct on which GRI's conspiracy claim against Baker is based, which means those connections are irrelevant for purposes of the specific jurisdiction analysis. Finally, the mere fact that Baker worked for a company with its headquarters in Illinois is not sufficient to establish personal jurisdiction over

him. A case on point is the Northern District of Illinois case of *Guaranteed Rate, Inc. v. Lapham*, 2012 WL 6138947 (N.D. Ill. Dec. 6, 2012), where GRI sued a former vice president in its San Diego, California office for breach of fiduciary duties and other claims in connection with her alleged solicitation of a coworker. The court dismissed the case for lack of personal jurisdiction because the defendant's "performance of her employment duties . . . was focused entirely on California," and "any solicitation that [the defendant] did with respect to the coworker—the conduct that form[ed] the basis for GRI's claims—took place in California." *Id.* at *3. Although GRI argued in *Lapham* that the defendant was subject to specific jurisdiction in Illinois because she had caused injury to GRI in Illinois, the court rejected that argument because the defendant's "actions . . . were aimed at California," not Illinois. *Id.* at *4. The court also rejected the premise that GRI suffered harm in Illinois because "any lost income that GRI experienced was lost in [California]," and any replacement employee GRI had to hire "was hired to work in California." *Id.* [16]

GRI's allegations against Baker have a similar attenuated connection to Illinois. All of Baker's allegedly tortious activity took place outside of Illinois, where Baker lived and worked. Even if Baker "knew" that he was accessing Illinois-based servers—and GRI has not alleged such knowledge—that would not be conduct that took place in the forum or was aimed at the forum by Baker. The role that Illinois

---

[16] Inexplicably, Baker does not cite to *Lapham* anywhere in his briefs. The Court was alerted to it, however, by CCMI, which cited to it in support of its motion to dismiss.

servers play in GRI's network is the result of conduct by GRI, not Baker. Thus, the Court rejects the conclusion that Baker's use of his work computer outside of Illinois constitutes conduct *in* Illinois simply because of the fortuity that GRI's network required routing through servers in Illinois. Moreover, if GRI were to be injured by Baker's use of the computer system, it would be in those states from which and with which Baker communicated through the system, none of which have been alleged or shown to be Illinois. Thus, as in *Lapham*, "there is no nexus between the activities underlying GRI's tort claims [against Baker] and the state of Illinois," *id*. at *3, and GRI cannot establish personal jurisdiction over Baker in Illinois.

Apart from an unconvincing attempt to distinguish *Lapham*,[17] GRI cites to a number of cases that supposedly hold that a court has jurisdiction over a

---

[17] GRI argues that *Lapham* is distinguishable because it involved only one loan officer as opposed to an attempt to "disrupt [GRI's] business across an entire region" causing a "substantial" effect on GRI in Illinois. R. 65 at 8 n.4. But the Court does not see the relevance of that factual distinction. While there may be more states involved here, none of those states are Illinois. And while this case may involve higher stakes because of the degree to which GRI's business may have been impacted by the loss of so many key employees, that impact is all in states outside Illinois, with the impact being felt in Illinois not because of the Individual Defendants' conduct directed at Illinois but because of the fortuitous fact that GRI maintains its headquarters here. Citing to cases such as *Jackson v. N'Genuity,* 2014 WL 4269448 (N.D. Ill. 2014), GRI argues that the extensive nature of the disruption to its business makes being haled into court in Illinois that much more foreseeable to Baker. But under *Walden* it is irrelevant how foreseeable the impact on the plaintiff in the forum state is if there is no alleged conduct connecting the defendant to the forum. The basis for the ruling in *Jackson* was not foreseeability alone, but foreseeability *plus* in-state conduct by the defendant that is simply not present here. *See id.* at *2 (where the defendant: (i) communicated daily with the plaintiff in Illinois; (ii) worked out of his home in Illinois for a seven year period when the relationship between the parties that was the basis of the suit and the seeds to their current dispute were first formed; (iii) travelled to Illinois at least once to meet with the plaintiff about the subject matter of the lawsuit; (iv) participated in a previous

nonresident employee in the state of the employer's corporate headquarters so long as the nonresident employee had contacts with the plaintiff's headquarters. What GRI ignores is that the cases it cites all involve claims for breach of a non-competition clause in an employment contract, whereas, here, GRI does not allege a claim against Baker for breach of the compensation agreement. It is well established that the personal jurisdiction inquiry depends on the type of claim being asserted, and, while GRI may have been able to bring a claim for breach of contract against Baker, its failure to do so has consequences. *See Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012) ("The district court characterized Felland's decision to bring a fraud claim instead of a contract claim as a 'tactical maneuver,' but tactical or not, the tort-vs.-contract distinction is highly significant to the personal-jurisdiction analysis."). Because the only claim against Baker is for conspiracy to induce breach of fiduciary duties, the Supreme Court's decision in *Walden*, not the breach of contract cases cited by GRI, controls the Court's personal jurisdictional analysis. And, for the reasons previously stated with respect to GRI's conspiracy claim against CCMI, under a *Walden* analysis, the Court does not have jurisdiction over Baker. *See Blue Beacon Int'l, Inc.,* 866 F. Supp. at 490 (upholding personal jurisdiction over the plaintiff's contract claim but dismissing for lack of personal jurisdiction the plaintiff's tort claim against the same defendant arising out of the same alleged misconduct forming the basis of the plaintiff's contract claim).

lawsuit that was the precursor to the current lawsuit and actually came to Illinois at least once in connection with that earlier lawsuit; and (v) traveled to Illinois on business for the benefit of the corporation in which both parties held an interest and was the subject of both the past and present lawsuits).

In any event, even if the Court were to apply the test for personal jurisdiction for a breach of contract claim, GRI's cases are factually distinguishable. In *U.S. Surgical Corp. v. Imagyn Med. Techs., Inc.*, 25 F. Supp. 2d 40, 45 (D. Conn. 1998), the court exercised personal jurisdiction over the defendant former employee where the employee entered into the contract in Connecticut, attended a six-week training session in Connecticut, came to Connecticut for sporadic sales strategy meetings, made telephone calls to Connecticut, and submitted his expenses for reimbursement to Connecticut. In *C.H. Robinson Worldwide, Inc. v. FLS Transp., Inc.*, 772 N.W.2d 528, 537 (Minn. Ct. App. 2009), the court approved personal jurisdiction over former employees who "all had on-going, regular contact with Minnesota during their employment," whose supervisors were located in Minnesota, who signed contracts with Minnesota choice of law provisions, and who repeatedly visited the state for training. In *Blue Beacon International, Inc.*, 866 F. Supp. at 490, the court asserted personal jurisdiction over an employee whose contract was governed by Kansas law, who regularly traveled to Kansas for work, and who was directly supervised from Kansas. And, in *A&R Logistics Holdings, Inc. v. Curl*, 2015 WL 5561179, at *2 (N.D. Ill. Sept. 21, 2015), the plaintiff allegedly violated a non-compete agreement governed by Illinois law and signed in exchange for stock options in an Illinois corporation. In addition, the plaintiff worked in Illinois for twelve years, returned to the state "regularly and frequently" for business purposes, and conducted "daily" phone calls with the plaintiff's Illinois headquarters, leading this Court to

characterize his employment as being "to a large degree [ ] associated with Illinois." *Id.* at *3.

In contrast to the facts in these cases, Baker did not enter into any contracts, attend regular meetings, or spend significant time in Illinois. There is no allegation Baker ever worked in Illinois or made daily calls to Illinois. His compensation agreement does not have an Illinois choice-of-law provision in it, he reported to Fedele who worked on the East Coast, and there is no allegation he regularly visited Illinois. To the contrary, GRI alleges only that Baker spent a total of five days in Illinois over the course of eight years as a GRI employee, all occurring prior to the events at issue here.

It is well established that the mere existence of a contract between a resident of the forum state and a nonresident is insufficient to subject the nonresident to the jurisdiction of the forum's courts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). A breach of contract claim can be litigated in the state where one of the contracting parties resides only if the dealings between the parties in regard to the disputed contract have a *"substantial connection"* with that state. *Id.* at 479 (emphasis in original). No single factor predominates, and the Court must weigh "all of the facts and circumstances of the parties' business relationship . . . as a whole." *Id.*

In *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003), the Eleventh Circuit explicitly "disapprove[d]" of *U.S. Surgical Corp.* for wrongly concluding "that a defendant's attendance at sales meetings is an 'event giving rise

to a claim' for breach of a covenant not to compete." The court held that the acts or omissions that gave rise in that case to the non-compete violation occurred in Georgia where the employee lived, worked, and signed the non-compete agreement and where the plaintiff suffered a loss to its business, not in Alabama where the plaintiff was located. And, in *Trinity Video Communications, Inc. v. Carey*, 2017 WL 1282247 (W.D. Ky. Apr. 4, 2017), the court found that the connections to Kentucky of former employees of a Kentucky corporation were too attenuated for a Kentucky court to exercise personal jurisdiction over them, notwithstanding that they signed an at-will employment agreement with the Kentucky corporation, those contracts called for the application of Kentucky law, and compensation, fringe benefits, and company e-mail accounts were administered from the company's headquarters in Kentucky. *Id.* at *3. While those connections tended to support the presence of personal jurisdiction, the court found "far more substantial considerations on the other side of the scale," namely all of the former employees resided in West Virginia; none sought employment in Kentucky; they were solicited, interviewed, and hired by a competitor in West Virginia to perform work exclusively in West Virginia; a manager supervised their work from that location; and none ever travelled to Kentucky to conduct business, attend meetings, or participate in social events. *Id.* at *3-4. This case involves facts far closer to *Jenkins Brick Co.* and *Trinity Video Communications* than the cases cited by GRI. Hence, Baker's limited connections to Illinois do not satisfy due process even if the Court were to approach that question as if this were a breach of contract case.

### 3. FORUM SELECTION CLAUSE AS APPLIED TO CCMI AND BAKER

Finally, GRI argues that the Court can assert personal jurisdiction over both CCMI and Baker based on the forum selection clauses in the compensation agreements of Fedele, Romano, Conn, and Stelzer. In support of that argument, GRI relies on the Seventh Circuit's opinion in *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436 (7th Cir. 2012), which GRI cites as standing for the principle that a nonparty can enforce a contractual forum selection clause whenever that nonparty is "closely related" to one of the contracting parties and/or to the lawsuit.[18]

Forum selection clauses generally constitute implied waivers of objections to both personal jurisdiction and venue in the selected forum. *See IFC Credit Corp. v. Aliano Bros. Gen. Contractors*, 437 F.3d 606, 610 (7th Cir. 2006); *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1290 (7th Cir. 1989); *see also Nw. Nat'l Ins. Co. v. Frumin*, 739 F. Supp. 1307, 1310 (E.D. Wis. 1990) ("when a party consents to venue in a particular court, it implicitly consents to the exercise of personal jurisdiction by that court"). But in *Adams,* no party was objecting to personal jurisdiction; the sole issue was venue. *See Solargenix Energy, LLC v. Acciona, S.A.,* 17 N.E.3d 171, 183 (Ill. App. 2014) (noting that several of the cases enforcing forum selection clauses against a closely related nonsignatory involve motions to dismiss

---

[18] *See* R. 65 at 4 ("'[T]he test for whether a nonparty to a contract containing [a forum selection] clause . . . will be bound by the clause . . . is whether the nonparty is 'closely related' to the suit.'") (quoting *Adams*, 702 F.3d at 439); *see also* R. 63 at 7-8.

for improper venue, not for lack of personal jurisdiction). The distinction is not insignificant. While objections to both personal jurisdiction and venue may be waived, venue "is primarily a matter of choosing a convenient forum" and "implicates no constitutional principle," 4D Fed. Prac. & Proc. Juris. § 3801 (4th ed.) (internal quotation marks and citation omitted), while "[d]ue process considerations are present in all personal jurisdiction inquiries," *Abelesz v. OTP Bank*, 692 F.3d 638, 660 (7th Cir. 2012).

Because *Adams* is a venue case, the issue here of whether a defendant may be found to have waived objection to personal jurisdiction based on a forum selection clause in a contract to which it is not a party is beyond the scope of what was contemplated by the Seventh Circuit in that case. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 738 (2007). Several other Seventh Circuit cases cited by GRI are unhelpful for the same reason.[19] Nevertheless, GRI cites *Synthes, Inc. v. Emerge Medical, Inc.*, 887 F. Supp. 2d 598 (E.D. Pa. 2012), wherein the court exercised personal jurisdiction over the objections of the chief operating officer of a competitor based on a forum selection clause in the employment agreements between the plaintiff and its former employees who allegedly formed the competitor in contravention of noncompetition provisions in the agreements. Analyzing the issue without reference to due process considerations

---

[19] *See Stifel, Nicolaus & Co. v. Lac Du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184 (7th Cir. 2015); *Frietsch v. Refco, Inc.*, 56 F.3d 825 (7th Cir. 1995); *Hugel v. Corporation of Lloyd's*, 999 F.2d 206 (7th Cir. 1993); *see also Manetti-Farrow, Inc. v. Gucci-Am., Inc.* 858 F.2d 509 (9th Cir. 1988) (holding that forum selection clauses involve venue issues, and enforcing such a clause against a nonsignatory to the contract without discussing the issue of personal jurisdiction).

on the ground that jurisdiction under a forum selection clause is based on "consent" rather than constitutionally minimum contacts, *id.* at 607, the *Synthes* court concluded that the nonsignatory defendant was "so closely related to the dispute between [the plaintiff] and [the former employees] that he should have reasonably *foreseen* that he would be bound by" the forum selection clauses in the employment agreements. *Id.* at 611 (emphasis added). GRI cites several other cases outside this jurisdiction applying the same foreseeability analysis to reach the identical result.[20]

The problem with these cases is that they fail to recognize the due process implications of their holdings. Instead, the courts in question apparently are of the view that due process "is [automatically] satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause.'" *ELA Med., Inc.*, 2007 WL 892517, at * 3 (quoting *Dominium Austin Ptns., L.L.C. v. Emerson,* 248 F.3d 720, 726 (8th Cir. 2001) (citing *Burger*

---

[20] *See Radian Guar., Inc.*, 18 F. Supp. 3d at 646-47 (competitors were bound by forum selection clauses in restricted stock unit grant agreement between plaintiff and employee because competitors sought to employ plaintiff's former employee while knowing she was employed under a contract with a non-competition agreement, such that competitors were sufficiently related to the employee as to foresee being bound by the forum selection clause); *St. Jude Med., S.C., Inc. v. Biosense Webster, Inc.,* 2012 WL 1576141, at *5 (D. Minn. May 4, 2012) (competitor was bound by forum selection clause in employment agreement because it was the competitor's act of employing the former employee that precipitated the plaintiff's lawsuit for breach of contract and tortious contractual interference); *ELA Med., Inc. v. Arrhythmia Mgmt. Assocs., Inc.,* 2007 WL 892517, at * 6 (D. Minn. Mar. 21, 2007) (competitor was bound by forum selection provision in employment agreement because it "actively sought the employ" of the former employee knowing she was then employed by the plaintiff under an agreement containing the forum selection clause, and therefore competitor "shared a common interest" in the action of "facilitating the immediate employment" of the former employee "unfettered by any restrictions in the [employment contract]").

*King,* 471 U.S. at 473 n. 14). The Supreme Court did state in *Burger King* that enforcement of forum-selection provisions does not offend due process when such provisions "have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust.'" 471 U.S. at 473 n. 14. But in making that statement, the Court was referencing the idea of an express contractual waiver. While *Synthes* and cases like it proceed as if they are enforcing an express contractual waiver, in reality only the actual contracting parties expressly agreed to the forum selection clauses. Insofar as the "closely related" nonsignatory is concerned, those courts are relying on an implied waiver. And while the cited footnote in *Burger King* refers to implied consents, that reference was not connected to the Court's subsequent statement about "freely negotiated" forum selection clauses.[21] Therefore, an argument that due process considerations are not implicated in the context of construing the conduct of a "closely related" party as impliedly consenting to an express waiver in a contract to which it is not a party, takes the Supreme Court's comments in *Burger King* out of context.

The Court has serious concerns over whether it would be "[ ]reasonable and [ ]just," *Burger King Corp.,* 471 U.S. at 473 n. 14, to apply a "close relationship" test that relies on "foreseeability" to find implied consent to personal jurisdiction. In the first place, as discussed in the previous section, due process considerations are not tied to "foreseeability" alone. *See Walden,* 134 S. Ct. 1115, 1124 (rejecting the lower

___

[21] Freely negotiated suggests that the topic is actually discussed, *i.e.,* an express waiver, whereas an implied waiver suggests that the topic is not explicitly discussed, *i.e.,* not negotiated.

court's conclusion that the defendant's knowledge of the plaintiff's "strong forum connections," combined with the "conclusion that [the plaintiff] suffered foreseeable harm in [the forum]," was sufficient to establish minimum contacts). If foreseeability cannot establish minimum contacts, it should not be a sufficient basis for finding a waiver or implied consent either.

Second, it does not make sense to tie the concept of implied consent to foreseeability. To give consent to personal jurisdiction is to waive objections to a court's assertion of personal jurisdiction. And a waiver is defined as "a conscious relinquishment of a known right." *Anderson v. Catholic Bishop of Chi.*, 759 F.3d 645, 651 (7th Cir. 2014). It "may be express or implied, but the evidence must show a clear, unequivocal and decisive act of a party demonstrating an *intent* to waive the known right." *Id.* (internal quotation marks and citations omitted). While it may be *foreseeable* to a nonsignatory who knowingly allows itself to become embroiled in a dispute related to a contract with a forum selection clause that it is at risk of being sued in the contractually selected forum, the foreseeability of that risk does not mean the nonsignatory *intended to relinquish* its constitutional right to be free from suit except in a forum with which it has minimum contacts. A court that holds such a nonsignatory is bound by the forum selection clause is really applying a concept more akin to forfeiture or estoppel than waiver or implied consent.

For these reasons, this Court agrees with those courts that have "decline[d] to apply the closely-related party doctrine to bind an out-of-state new employer to [a particular forum] based on a contract to which it was not a party and where it did

not voluntarily join the contracting employee in any litigation." *Medtronic, Inc. v. Amanda Ernst & Nevro Corp.,* 182 F. Supp. 3d 925, 933-34 (D. Minn. 2016); *see also RK Env't, LLC v. Lloyd*, 2015 WL 8536556, at *4-5 (D.N.J. Nov. 25, 2015) ("This Court . . . does not find the *Synthes* decision to be persuasive. Nor does the Court find that the other out-of-District decisions that Plaintiff has cited add to the analysis such that they merit further discussion here.").

Nothing about the above discussion is meant to call into question the holdings in *Adams* and similar cases which permit nonsignatories to enforce forum selection clauses or, conversely, hold that nonsignatories may be bound by forum selection clauses, at least insofar as venue is concerned, based on principles, among other things, of (1) corporate affiliation (*Stifel, Nicolaus & Co; Adams; Hugel*; *Solargenix Energy; Manetti–Farrow, Inc.; see also Tate & Lyle Ingredients Ams., Inc. v. Whitefox Techs. USA, Inc.*, 949 N.Y.S.2d 375 (App. Div. 2012));[22] (2) mutuality (*Stifel, Nicolaus & Co.; Adams; Hugel*);[23] and (3) other specified circumstances not

---

[22] "Affiliation" refers to corporate relatedness. *See United Airlines, Inc. v. Zaman*, 152 F. Supp. 3d 1041, 1054 (N.D. Ill. 2015) ("Affiliation means that the non-signatory shares a corporate relationship with a signatory, such as two corporate affiliates or, as was the case in *Adams*, 702 F.3d at 439, a parent and its subsidiary."). Corporate relatedness at least as far as venue is concerned is not necessarily limited to corporate structure. For instance, in *Stifel, Nicolaus & Co.*, 807 F.3d at 212, the Seventh Circuit applied the concept to permit legal counsel to one of the contracting parties to invoke the forum selection clause in the contract for venue purposes where he was also counsel to the underlying bond transaction at issue in the lawsuit.

[23] "Mutuality is the principle that if a signatory can enforce the forum selection clause against a non-signatory, then the non-signatory should be allowed to do the same." *United Airlines, Inc.*, 152 F. Supp. 3d at 1054-55 (citing *Adams*, 702 F.3d at 441-43, as an example, where "the plaintiffs, who were signatories, alleged that . . . Starwood, a defendant who was a non-signatory[ ] was engaged in a conspiracy to

present here, *see, e.g., Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995) ("cat's paw"); *Fcstone, LLC v. Adams*, 2011 WL 43080 (N.D. Ill. Jan. 6, 2011) (husband/wife scenario); *Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 889 (7th Cir. 2004) (parties to other contracts that, together with the contract containing the forum selection clause, form a cohesive contractual scheme).

These cases simply are not applicable here because the record contains no evidence of corporate affiliation,[24] mutuality, or any of the other types of relationships discussed in the case law. Given that none of the factual circumstances at issue in those cases are present here, the Court need not analyze the question of whether the holdings of those cases would permit a waiver of personal jurisdiction, as opposed to objections to venue. Recognizing the possibility that certain types of formal legal relationships between the contracting party and the non-contracting party may sufficiently satisfy due process considerations to hold the non-contracting party bound as a matter of law by the express waiver of the contracting party, it is enough to say that this case involves no such formal legal

---

defraud with the parent company of another signatory," and the "Seventh Circuit explained that the plaintiffs were allowed to enforce the clause [for venue purposes] against Starwood under the principal-agent theory that contracts can be enforced against secret principals, *i.e.*, Starwood").

[24] An employment relationship is not the same as a corporate affiliation. To the extent that *Stifel, Nicolaus & Co.* applied the affiliate concept more broadly to encompass legal counsel for the corporate transaction at issue, it did so in the venue context and primarily because of the nonsignatory's relationship to the transaction at the time the contracting parties entered into the contract containing the forum selection clause. Here, there was no employment relationship of any kind between CCMI and the Individual Defendants at the time the Individual Defendants entered into the compensation agreements.

relationship. The Court's holding here is limited to personal jurisdiction and the "closely related" concept based on foreseeability that GRI argues should be applied in a situation where no formal legal relationship exists (other than the recent employer-employee relationship between CCMI and the Individual Defendants who agreed to forum selection clauses in their compensation agreements with GRI). And the salient teaching of Seventh Circuit precedent insofar as that issue is concerned is that the Seventh Circuit neither endorses the "vague," *Adams,* 702 F.3d at 439, and "[un]illuminating," *Frietsch*, 56 F.3d at 827, concept of "closely related," nor believes that "recasting [that standard] as an issue of 'foreseeability' helps," *id.* Unable to articulate any basis for enforcing the forum selection clauses in the Individual Defendants' compensation agreements against noncontracting parties CCMI and Baker other than by reference to the rejected concepts of "closely related" and "foreseeability," GRI's waiver argument fails to persuade. The Court thus concludes that CCMI and Baker are not subject to personal jurisdiction in Illinois based on the forum selection clauses in the compensation agreements to which they are not parties.

## B. DISCOVERY

CCMI has filed a related motion for a protective order in which it asks the Court to stay discovery pending resolution of its motion to dismiss. GRI has a pending motion for a preliminary injunction and a hearing is scheduled to take place on that motion on September 25, 2017. Because of the potential need for discovery leading up to that hearing, the Court declined to grant CCMI's motion for

protective order when it was first presented. Instead, the Court entered and continued the motion until after the Court ruled on CCMI's motion to dismiss for lack of personal jurisdiction. In doing so, the Court explicitly noted that CCMI would be engaging in involuntary discovery upon order of this Court, and would not be seen as having waived its objection to personal jurisdiction.

The Court now grants CCMI's motion to dismiss for lack of personal jurisdiction and, simultaneously, also grants CCMI's motion for protective order, effectively putting a stop to any further discovery against CCMI as a party to this case. Because GRI may have relied for purposes of the up-coming preliminary injunction hearing on discovery requests already promulgated to CCMI, the Court directed CCMI on August 17, 2017, when the parties appeared for a status and the Court orally informed them of its personal jurisdiction ruling, to complete any discovery already issued or scheduled prior to that date. In doing so, again, CCMI will not be deemed to have waived its objection to personal jurisdiction as it would be cooperating with the completion of any previously served discovery requests only upon order of the Court.

In its brief in opposition to CCMI's motion to dismiss, GRI requests that, to the extent the Court rules GRI has not sufficiently substantiated its argument that CCMI "purposefully directed" its conduct at Illinois, the Court should grant GRI leave to take limited jurisdictional discovery relating to CCMI's communications with the Individual Defendants regarding their compensation agreements with Guaranteed Rate. R. 65 at 10. But such communications would not establish

purposeful direction by CCMI towards Illinois. At most, it would support the allegation that CCMI was aware of the Individual Defendants' compensation contracts with GRI and the likelihood that CCMI might be sued based on those agreements. The Court already has assumed those facts and found them to be unconvincing as a basis for specific jurisdiction. Therefore, GRI's request for jurisdictional discovery is denied.[25] GRI's request for jurisdictional discovery against Baker is denied for similar reasons.

### C. CRAIG STELZER

Stelzer has filed a Rule 12(b)(6) motion to dismiss in which he argues that the complaint's allegations do not state a plausible claim against him. A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-

---

[25] *See John Crane Inc. v. Simon Greenstone Panatier Bartlett, APC*, 2017 WL 1093150, at *12 (N.D. Ill. Mar. 23, 2017) (denying request for jurisdictional discovery made, like here, in a footnote of the plaintiff's brief, because "[p]laintiff's allegations and briefing demonstrate that jurisdictional discovery is not necessary") (citing *Cent. States, Se. and Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) (holding that, "[a]t a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted"); *Sanderson v. Spectrum Labs, Inc.*, 248 F.3d 1159 (Table), 2000 WL 1909678, *3 (7th Cir. 2000) (When the lack of personal jurisdiction is clear, jurisdictional discovery would serve no purpose and should not be permitted.") (citations omitted)).

defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

Stelzer is named in Count II alleging a claim for conspiracy to breach fiduciary duties. Specifically, Count II alleges that "Defendants Fedele, Conn, and Romano owed fiduciary duties to [GRI], including duties of full disclosure, good faith and loyalty," which fiduciary duties were known by all of the Defendants, including Stelzer. R. 26 at 14 (¶ 43). In furtherance of the conspiracy to breach these fiduciary duties, GRI alleges that "*Defendants*" engaged in the following conduct:

> (i)     Fedele, Conn, Romano and Baker secretly marketed themselves as a group for employment with GRI's competitors, including CCMI;
>
> (ii)    CCMI induced Fedele, Conn, Romano, Baker and Stelzer to resign from GRI and join CCMI as a group, and to conceal their actions from GRI, notwithstanding their fiduciary obligations to GRI;
>
> (iii)   *Defendants* planned for the opening of CCMI's branch offices in GRI's Eastern Division, and used GRI's

confidential information to prepare and evaluate pro forma financial statements for the benefit of CCMI;

(iv)  *Defendants* solicited each other to join CCMI and induced each other to solicit Stelzer and other employees of GRI to terminate their employment with GRI and to join CCMI;

(v)  *Defendants* arranged for GRI employees to meet and interview for employment with representatives of CCMI, and;

(vi)  *Defendants* coordinated the simultaneous resignations of Romano and Stelzer on April 17, 2017, and the subsequent resignation of Fedele, in order to injure GRI and to induce other GRI employees to join CCMI.

*Id.* at 14-15 (¶ 45) (emphasis added).

According to Stelzer, GRI's conspiracy claim against him should be dismissed because GRI uses group allegations. *See Bank of America, N.A. v. Knight*, 725 F.3d 815 (7th Cir. 2013) ("A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy."). GRI counters that it is clear enough from the allegations of the complaint quoted above that, where the term "Defendants" is used, it means all Defendants, including Stelzer. *See Atkins v. Hasan*, 2015 WL 3862724, at *4-5 (N.D. Ill. June 22, 2015) ("the allegations mean just that: the defendants—all of them"). Therefore, GRI argues, Stelzer has adequate notice of the basis for the claim against him. *See Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009) (noting that collective pleading is permissible where it is clear that the plaintiff is directing its allegations "at all of the defendants"); *Slep-Tone Entm't Corp. v. Coyne*, 41 F. Supp. 3d 707, 714 (N.D. Ill. 2014) ("It is not impermissible lumping to allege that each defendant, on his or her own, engaged in precisely the same misconduct.").

The problem with GRI's argument is that, while GRI may be able to use the collective term "Defendants" if that is what GRI intended, other allegations in the complaint suggest that is *not* what GRI intended. For instance, GRI alleges in Counts I and III that *only* Fedele, Conn, and Romano breached their fiduciary duties to GRI and violated their "*in term* non-solicitation covenants" by secretly marketing themselves to GRI's competitors, soliciting other employees of GRI (including Stelzer) to join them at CCMI, arranging for GRI employees to meet and interview for employment with representatives of CCMI, and planning for the opening of CCMI's branch offices in GRI's Eastern Division using GRI's confidential information to prepare and evaluate pro forma financial statements for the benefit of CCMI. Yet paragraph 45 of the conspiracy claim against Stelzer uses the collective "Defendants" to suggest that all of the defendants, including Stelzer, did all of those things, including the potentially illogical allegation in paragraph 45(iv) that Stelzer solicited himself.[26]

If Stelzer personally engaged in the same conduct as Fedele, Conn, and Romano, then why did GRI omit Stelzer from the Count I claim for breach of fiduciary duty and the Count III claim for breach of the non-solicitation covenant? In this regard, the Court notes that the allegations in the current complaint under Counts I and III against Fedele, Conn, and Romano were made in the original

---

[26] Conceivably, sense can be made of the allegation that Steltzer both was the target of solicitation and a conspirator who engaged in solicitation by adding timing and context. Stelzer could have been solicited by the other Individual Defendants before he joined the conspiracy. When he agreed to join the conspiracy, he could have then solicited other employees. The problem is that the complaint does not include allegations providing this timing and context.

complaint against *Stelzer*, Conn, and Romano.[27] It seems more than likely, therefore, that GRI's omission of Stelzer in the amended complaint from Counts I and III was purposeful.[28] If so, then the pleading in Count II of similar conduct using the term "Defendants" does appear to be an attempt to impose liability on Stelzer premised on an improper "theory of collective responsibility." *Knight*, 725 F.3d at 818. At the very least, the collective references to "Defendants" in Count II, in light of the similar allegations against only Fedele, Conn, and Romano in Counts I and III, "causes confusion. . . obscuring which defendant is alleged to have committed which act." *Tivoli LLC v. Sankey,* 2015 WL 12683801, at *4 (C.D. Cal. Feb. 3, 2015).

Nevertheless, the Court need not decide whether GRI's collective pleading is merely the result of imprecise pleading, *see In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 136 F. Supp. 3d 968, 977 (N.D. Ill. 2015), or a strategy to obscure what GRI knows and does not know about the facts at this early stage of the litigation. Either way, the Court does not agree with Stelzer that he has received insufficient notice of the conspiracy claim against him in the same way that notice was lacking in the *Knight* case. In *Knight*, the allegation was that "'the defendants looted the corporation'—without any details about who did what." 725 F.3d at 818. The details of the alleged looting were

---

[27] Fedele was not named as a defendant at all in the original complaint.

[28] Perhaps GRI only had a good faith factual basis for making those allegations against Fedele, Conn, and Romano, although conceivably GRI might have made use of the device of pleading "upon information and belief" to include Stelzer in those allegations.

involved and complex, *id.* at 819, which made the plaintiff's failure to give any indication of which defendants engaged in which acts problematic.

Here, GRI has adequately pled the elements of a conspiracy claim. That is, GRI has pled (1) an agreement among defendants, "[s]tarting no later than March 2017, . . . to unjustly enrich themselves by unfairly competing with [GRI], depriving [GRI] of its relationships with its valued employees, and otherwise inflicting unfair competitive injury on [GRI]." R. 26 at 14 (¶ 44) (emphasis added); and (2) the tortious acts of co-conspirators Fedele, Conn, and Romano consisting of solicitation of GRI employees and disclosure of GRI's confidential business information. *See Dames & Moore v. Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817, 824 (N.D. Ill. 1998) (setting forth the elements of a civil conspiracy claim). Moreover, the specific details of the alleged conspiracy are not complex. They involve the marketing of GRI employees to competitors, the solicitation of other GRI employees to leave GRI with the conspirators, and the sharing of GRI's confidential business information with CCMI. Because Stelzer is not alleged to have committed the underlying tort of breach of fiduciary duty which forms the basis for the conspiracy claim, GRI does not need to allege that Stelzer committed any tortious conduct himself. As a result, the fact that the complaint inadequately or confusingly alleges conduct that Stelzer may or may not have engaged in is not dispositive of the legal sufficiency of GRI's conspiracy claim against Stelzer. Stelzer is on notice that GRI seeks to hold him liable not for actually doing any of the underlying tortious acts (although he may have) but for agreeing to participate in a plan to do them. *See Adcock v. Brakegate,*

*Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994) ("The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts.").

The real question then is whether the allegations plausibly suggest that Stelzer knew about the conspiracy and joined in it. *Kidron v. Movie Acquisition Corp.*, 47 Cal. Rptr. 2d 752, 757-58 (Ca. App. 1995) ("The *sin qua non* of a conspiratorial agreement is the knowledge on the part of the alleged conspirators of its unlawful objective and their intent to aid in achieving that objective.") (internal quotation marks and citation omitted); *see Knight*, 725 F.3d at 818 ("Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope."); *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995) (there must be enough evidence to "demonstrate a participatory link between the conspiracy and the defendant"); *Uppal v. Welch*, 2016 WL 2909652, at *10 (N.D. Ill. May 19, 2016) ("each defendant's agreement to join the conspiracy is a necessary and important element of this cause of action") (internal quotation marks and citation omitted). GRI must allege facts that make it plausible not only that Stelzer participated in the conspiracy, but that his participation was "knowing[ ] and voluntar[y]." "A defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Adcock*, 645 N.E.2d at 894. Participation that is "accidental, inadvertent, or negligent" does not suffice. *Id.*

Stelzer's joint participation in the conduct alleged in the paragraphs of the complaint using the collective "Defendants" would certainly make the allegation that Stelzer joined the conspiracy more plausible. *See, e.g., Chur v. Hong*, 249 S.W.3d 441, 446-47 (Tex. 2008) ("inferring an agreement to the ultimate injury generally arises from joint participation in the transactions and from enjoyment of the fruits of the transactions"). But even if the Court disregards any allegations that use the collective "Defendants" and assumes that Stelzer did not personally commit the acts alleged in those paragraphs, the Court still would conclude that the conspiracy claim against Stelzer, though thin, is nonetheless plausible. It is undisputed that Stelzer made a demand for further compensation from GRI, then resigned and began working for CCMI, just as the other Individual Defendants had done. GRI alleges that Stelzer's resignation was presented to it by email from Romano virtually simultaneous with Romano's own resignation. This parallel conduct certainly suggests that Stelzer knew about and was participating in the alleged conspiracy. Disregarding the conduct alleged using the collective "Defendants," Stelzer's exact role in the conspiracy is unclear, which raises the question of whether he was *solely* engaged in parallel conduct rather than participation in a conspiracy. *See United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir. 1988) (the plaintiff has "to show more than mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions") (internal quotation marks and citations omitted). But ultimately that is an evidentiary issue to be resolved at a later point in these proceedings. It is

enough at this point that GRI has alleged a plausible basis for inferring that Stelzer did reach an agreement with the other defendants regarding their breaches of fiduciary duty and intended to join in that common scheme. Accordingly, Stelzer's motion to dismiss is denied.

## CONCLUSION

For the foregoing reasons,

(1)     CCMI's Motion to Dismiss, R.33, is granted, and CCMI is dismissed without prejudice for lack of personal jurisdiction.

(2)     CCMI's Motion for Protective Order, R. 48, granted upon the terms and conditions set forth in this Memorandum Opinion and Order;

(3)     Terry Baker's Motion to Dismiss, R. 46, is granted, and Baker is dismissed without prejudice for lack of personal jurisdiction; and

(4)     Craig Stelzer's Motion to Dismiss, R. 37, is denied.

IT IS SO ORDERED

_Thomas M. Durkin_

Thomas M. Durkin
United States District Judge

Dated: August 28, 2017